FEEGLES et al. v. SLAUGHTER et .al.
(No. 7427.)

(Court of Civil Appeals of Texas. Dallas. Dec. 18, 1915. Rehearing Denied Jan. 22, 1916.)

1. WILLS ⬤⟿600 — CONSTRUCTION — ESTATE CONVEYED.

Where a will, in the first clause, gave testator's property to his wife without limitation, but declared in another that whatever property the wife might own at her death should be equally divided between her relatives and testator's, but that she should have full power of control and disposition during her life, such will did not limit the wife's rights in the property to a life estate, since it is a primary canon of construction that the intention of the testator should be discovered and effectuated whenever possible, and in case of repugnancy that construction is favored which admits of immediate vesting of the entire estate.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1335–1339; Dec. Dig. ⬤⟿600.]

2. WILLS ⬤⟿487—ACTION TO CONSTRUE—AMBIGUITY—ADMITTING PAROL EVIDENCE.

Where testator's will gave his property absolutely to his wife, and provided that whatever might be left at her death should be equally divided among their relatives, also giving her full power to control and dispose of the property during her life, the latter clause was not such a legal limitation upon the estate granted the wife at first as to make the will ambiguous and permit evidence of the maker's intention different from the legal import of the will itself.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1023, 1026–1032; Dec. Dig. ⬤⟿487.]

3. WILLS ⬤⟿693—POWER OF DISPOSITION—EXERCISE—EFFECT.

Where testator's will gave his wife a life estate, with remainder to their relatives, and full power to control and dispose of the property, the wife's acts of disposition during her life cut off the remaindermen's contingent right.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1655–1661; Dec. Dig. ⬤⟿693.]

4. WILLS ⬤⟿600—POWER OF DISPOSITION—FOLLOWING PROCEEDS.

Where testator's will gave his property to his wife with power of control and disposition, whatever should be left on her death to go to their relatives, such relatives could not pursue the proceeds of the property sold by the wife.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1335–1339; Dec. Dig. ⬤⟿600.]

5. WILLS ⬤⟿693—POWER OF DISPOSITION—GIFT.

Where testator's will gave his wife absolute power to control and dispose of the property left her, whatever might be left on her death to go to their relatives, a disposition by the wife by gift was effectual to bar the relatives' right.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1655, 1661; Dec. Dig. ⬤⟿693.]

6. DEEDS ⬤⟿17—CONSIDERATION.

Where the grantee of realty paid the grantor $10 cash, provided an annuity of $600 for her, and agreed to render her personal services in caring for her as a daughter would her mother, which she did until the grantor's death, there was consideration for the conveyance.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 26–37; Dec. Dig. ⬤⟿17.]

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Suit by Mrs. S. A. Feegles and others against C. C. Slaughter and others for the construction of a will and the recovery of property. From a judgment for defendants, plaintiffs appeal. Affirmed.

Henry P. Edwards and Cockrell, Gray & McBride, all of Dallas, for appellants. Thompson, Knight, Baker & Harris, Towne Young, and Carden, Starling, Carden, Hemphill & Wallace, all of Dallas, for appellees.

RAINEY, C. J. Appellants, relations of J. B. D. Young, deceased, brought this suit against the appellee to construe the last will and testament of the said Young, and to recover the property devised therein, which property was willed by the said Young to his wife, Mrs. L. V. Young, and by her willed to Mrs. Ann A. Knight, and to recover the property or proceeds alleged to have been devised by the will to plaintiffs. The general issue was joined, and upon hearing the evidence the court instructed the jury to return a verdict for the appellees, which was done, and judgment was so rendered, from which this appeal is prosecuted.

J. B. D. Young and L. V. Young for years lived together as husband and wife. He was over 65 years old and she was over 60 years old when he died. They had only one child, which died in early infancy. They, as husband and wife, accumulated the property which is the subject of this suit. J. B. D. Young came to Texas in an early day, leaving his relatives in one of the older states, and thereafter had no contact with them. Mrs. Young had some relatives, whose names and addresses are not known, except a sister, Mrs. Feegles, one of the appellants, whose personal relations with Mrs. Young were not congenial. None of the appellants were dependent on Mr. and Mrs. Young.

On May 1, 1901, J. B. D. Young executed his last will and testament, and thereafter on June 3, 1901, died, owning the property in suit. His will was duly probated, and Mrs. Young qualified as sole executrix. Said will is as follows:

"The State of Texas, County of Dallas.

"Know all men by these presents: That I, J. B. D. Young, of the above named county and state, being of sound mind and disposing memory, do make this my last will and testament.

"I. It is my will and desire, and I do hereby

bequeath all my property, both real and personal, to my beloved and faithful wife, Mrs. L. V. Young.

"II. I do hereby constitute and appoint my wife my sole executrix, and direct that no bond shall be required of her.

"III. I desire and direct that no proceedings shall be had in court in reference to my estate, other than probate of my will, and the filing of an inventory and appraisement.

"IV. I direct that all my just debts shall be seasonably paid.

"V. I further desire and hereby will and direct that upon the death of my wife the property which she then owns shall be equally divided between her relatives and my relatives, it being intended that she shall have full power to control and dispose of the property during her life.

"Witness my hand this May the 14th, 1901.

"J. B. D. Young.

"Witnesses:

"N. W. Finley.

"V. E. Armstrong."

Soon after the probate of this will Mrs. Young took charge of said property and sold to Guy Sumpter one tract for $15,200 cash, which was used by her in building a home and for other things. In 1902 she sold to R. E. L. Knight for a valuable consideration a tract, the consideration being $3,000 cash, and in 1905 she sold to said Knight a tract for a consideration of $300 cash. Knight was J. B. D. Young's attorney during his lifetime, and after his death continued to be Mrs. Young's attorney.

On September 23, 1902, Mrs. Young executed her last will and testament, by the terms of which she devised all her property to Mrs. Ann A. Knight, wife of R. E. L. Knight. On April 23, 1913, Mrs. Young died, making no other will, which will was probated in July, 1913.

In 1902 Mrs. Young deeded to Mrs. Knight the Slaughter tract, the consideration recited in the deed being "$10 and other valuable considerations." The deed retained a life estate in Mrs. Young. Said tract was renting at the time for $150 per month. Mrs. Young received the rents on said property until December 24, 1906, when she and Mr. and Mrs. Knight executed a deed to C. C. Slaughter for said tract for $35,000 cash paid; $10,000 of the money Mrs. Young transferred to Mrs. Knight, upon Mr. and Mrs. Knight's agreement to pay her thereafter $600 a year for her life. The remaining $25,000 of the consideration they invested in the purchase of the Bosbyshell tract on Elm street, near Lamar, taking a deed from Bosbyshell to Mrs. Young, and she in turn, within a few days thereafter, executed a deed to Mrs. Knight, wherein she undertook to reserve the life estate in the tract and convey the remainder to Mrs. Knight; the deed being exactly similar in form to the one that she had formerly executed to Mrs. Knight to the Slaughter tract. Mrs. Young continued thereafter to receive the rents, amounting to about $175 a month, on the Bosbyshell tract, and to use them, until August 30, 1912, when Mrs. Young and Mr. and Mrs. Knight, for a consideration of $40,000, deeded said

Bosbyshell tract to one Hart, $9,000 of the consideration being a lot on Ross avenue (Ross avenue tract), and the remaining $31,000 being Hart's notes. Mrs. Young and Mr. and Mrs. Knight then made an agreement, and carried it into execution, by which Mr. and Mrs. Knight agreed to pay Mrs. Young $150 a month for her life and relieve her of taxes, in consideration whereof Mrs. Young made over to Mrs. Knight the $31,000 Hart notes, and the Ross avenue tract was deeded to R. E. L. Knight for Mrs. Knight's benefit.

Mrs. Knight's testimony is quite lengthy, but is practically uncontradicted, and from which excerpts are taken to the effect as follows:

"I remember the occasion in January, 1902, when Mrs. Young made deed to me to the Slaughter tract of land. The deed recites the consideration of $10 and other valuable considerations. The first conversation that Mrs. Young and I had concerning her intention to deed me that property was on my way home from town. I had been down in Dallas shopping with her, and going home she made that proposition, and we discussed it going home, all the way out from Sangers. She just simply said she wanted to make a trade with me. She had a proposition to submit. She said she was alone, and that she missed Mr. Young very much, and she felt her dependence, and she thought this matter over and had decided to buy my services. She had to buy somebody's, and she wanted to have me promise that I would take care of her and do these things I have said for her, and in fulfillment of that she would deed me this property. She said I should take care of her and look after her. I don't mean financial support; she was able to take care of herself financially. In addition to the $10 that I was to pay for the deed to this property, I was to give her love and affection, and my attention, and administer to her during her lifetime. I was to respond to any call at any time that she should make on me. I was to look after her while she was sick, and do all that a daughter should have done, and I was to look after her during her sickness, and see that she was properly buried, look after her grave after she was gone, also that of Mr. Young. I don't remember what was said exactly when she handed me the deed; she just merely asked me for the $10, and responding to that I paid her the $10. We talked it over and I explained to her that I felt that I would be willing. We had always been friends of long standing, and I was sure I was generous and kind enough at heart to look after her without, and I didn't like to sell my services to a friend, but she would have it that way, because, she said, she might live to be a very old woman, and become a very great tax and a care on me, and she would not be satisfied or comfortable until she was sure she had bought me and I would accept it on that condition; that is, that I would permit her to buy me, and the obligation did not end with her death. It is going on now. I told her I would not consider it at all until I discussed it with my own family, my mother and brothers. I thought it was too great a task, too great a responsibility, and I was not sure of my own character. I did not know whether or not I had the dignity of character to keep a trade like that, and I was not willing to go into it unless I had advised with my family. I did not accept the proposition at once, but certainly within two days I accepted her proposition. I cannot tell you all the services I performed for Mrs. Young after she made me that deed. I called her up over telephone frequently to know how she was doing, and, if she needed anything, or wanted anything, and I

helped her to rent the house when it was vacant. I put advertisements in the newspapers and looked up people to go out and live with her. I shopped with her, helped her buy her clothes, hats, furniture, helped her buy a horse and buggy, and there was nothing that you could detail that could be done for anybody that I didn't do for her, or help to do, and frequently did it all. She went away awhile in the summer, and she came to my house and visited in the home of my family. Yes; in my pleadings I have alleged that I was to give Mrs. Young all the nurture, assistance, aid, and every attention that might be required in sickness or health during her lifetime, and I would render unto her just everything that she ever demanded or ever wanted. I gave her exactly what I gave to my mother. I responded to her requests, to any requests that she might make at any time, regardless of what my condition was. She never phoned me to come down there that I didn't go, unless I wasn't well. I was never phoned to or called for that I didn't respond immediately at any time. The agreement was that I was to give her my time, give her all the nurture, assistance, aid, that she needed, and my position, my duty, toward Mrs. Young was that of daughter. She demanded of me exactly what my mother would have, and I used to look after her when she was sick, took care of her, and protected her in every way. I looked after her in any way just as I would have done my own mother. I was present at the death of Mrs. Young. When she died she lacked 2 days of being 77 years of age. I would like to say this: I felt doubly responsible for her welfare, not only because she had paid me to take care of her and look after her, but Mr. Young had asked me to do it the Sunday I went out there. He turned her over to me. He was dying, and he asked me to take care of her, because he knew her condition of loneliness. I was very fond of Mrs. Young or I could not have done what I did for all the money she had. I felt as a daughter toward her. I am quite sure I would have done this without a dollar. I am quite sure I would have. I did not exact of her any agreement to give me her property before I agreed to it. It was her own proposition. I remember the sale of the tract of land to Col. Slaughter, for which he paid $35,000. There was $25,000 of it paid for the Bosbyshell property. I kept the other $10,000. It was mine. I bought Mrs. Young's life estate in the $10,000 by paying her $600 a year for life. I kept the $10,000 and paid her $600 a year as long as she lived, two payments a year, $300 at each time. The other $25,000 was used in the purchase of this tract on Elm street, known as the Bosbyshell tract of land. Immediately after purchasing the Bosbyshell tract, which was deeded to Mrs. Young, she in turn deeded it to me, and reserved a life estate in it. It was understood between her and me before Bosbyshell made the deed that that should be done. In 1912, about a year before she died, she and I sold the Bosbyshell tract to Mr. Hart for $40,000. The consideration was in part a lot on Ross avenue, and the balance in notes. The notes aggregated $31,000. I have those two small notes yet. The $20,000 note has been disposed of. I paid a debt off with it. It is a fact that when we sold the Bosbyshell tract of land to Mr. Hart Mrs. Young turned the notes over to me. Mr. Knight was Mrs. Young's attorney at the time she made that proposition in the buggy, and he continued so at all times thereafter up to the time of her death, but he had nothing to do with this deed. I know that Mrs. Young had the supremest confidence in Mr. Knight, and Mr. Young did too. I suggested to Mrs. Young that she go to Mr. Coke. Nobody suggested it to me. Mr. Knight did not suggest it to me. I made the suggestion myself. I wanted Mr. Coke to do it. I didn't want it to be a family

matter. I wanted Mrs. Young to get a lawyer who could advise her, and with whom feel perfectly free to discuss this matter, and I wanted it fixed in the best way possible to protect Mrs. Young during her lifetime. I wanted it to be a valid transaction. I had already discussed it with Mr. Knight in Mrs. Young's presence. I do not know that Mrs. Young knew that she could not will away the property. She never said anything to me about not being able to will it away. I never knew anything about Mr. Young's will. I suppose I knew that he had left one, but there was never any discussion of it. I suppose that fall when I returned from Kentucky after the will was probated was when I first knew of it, if at all. I did not read it. I never saw it. I don't know what he said about his relatives. Nobody ever told me he had made a will in which he mentioned his relatives and her relatives. The first time I ever saw a copy of the will was in these pleadings. There was no discussion between us about Mr. Young's will, no discussion between Mrs. Young and myself. I suppose she knew all about his will, and she certainly thought she had the right to do as she pleased. The Mr. Coke who attended to the matters for Mrs. Young was Mr. Alex Coke. When Mrs. Young turned the notes over to me that were given for the Bosbyshell tract, I bought her life interest in those notes, and the proceeds of the Bosbyshell tract, by paying her $150 a month during her lifetime, which was a little more net than she had realized monthly from the building, and I agreed, with Mr. Knight's approval, and in his presence, to do that. I also agreed to pay the taxes on the home place, which was perhaps all the taxes she had. I did not have possession of the place, but thereafter I was to pay the taxes on the home place. The Bosbyshell tract of land was sold in August, and we were to pay all of her taxes after that year. That was in 1912. My understanding was that I was to pay all the taxes beginning with the year 1913. The notes were turned over to me in August, and we paid her in August, September, October, November, December, January, and straight on up to the time of her death in monthly installments of $150 each. Mrs. Young was talking to me, and she says: 'Whatever happens to me, Miss Ann—if I die, or whatever comes to me and my lot, do not call those people. I don't want those people notified, because they turned the back of their hand to me when I needed them, and now I don't want any of them, and I don't want any of them apprised of my condition or of my death.' That interview must have been two weeks before Mrs. Young died. Mrs. Feegles did not come over until after Mrs. Young was dead. I have already related the facts about Mrs. Young going away with us on a vacation trip to Chicago. She went every summer from 1902 to 1912 with us. We went one summer to Hot Springs for a month. One summer we went to Kentucky, and Mrs. Young went with me and visited my friends. One summer we went to Quebec and Toronto, and down there on Lake Champlain, Lake George and down to Boston and New York. One summer we went to the Jamestown Exposition. One summer to Michigan, and then we went three years in succession, I think, to New York City. I don't know whether that covers the period of years or not, but it is as nearly correct as I can be just now. She always went with us as a friend and equal. The members of my family always treated her as the most respected one of the family, and she was looked upon by strangers and people in the hotels as the children's grandmother, and it pleased her very much. They were so considerate of her that it pleased her to have people think that she was the grandmother of those children. Her mental vigor was just wonderful. She was as strong-minded as I ever knew a woman to be. She had extraordinary

intelligence. She had taken advantage of every opportunity that came her way, and she regretted very much not having had the experience of traveling and the advantages of traveling until it came to her in later years. She enjoyed it very much. She was younger and entered into the spirit of it even more than the younger members of the family. Her attitude toward every one was just youthful, interested in everything, theaters, and after that the café, and that feature of life. ·We stopped at the very best of hotels. The attitude of the children toward her, and the attitude of her toward my children, was the attitude of a grandmother. She was just as fond of them as she could be, and made a great deal more over them than either of their own grandmothers. Mrs. Young's reading in her later years was this way: She could read the paper. It took her some little time to read over the fine print, but she could read the transfers of property. She was always interested in the business affairs of Dallas, and she could read about the permits being issued for new buildings. She kept up with all the growing conditions of Dallas by reading the paper. I do not think she read books to a very great extent. She read the Bible. I do not know of her reading generally except the paper and the Bible. I do not know that she read anything else much. She was a member of the Methodist Church. There never was a time after we made the trade when I· felt that I could overlook a single want of Mrs. Young's. She did not want to accept the services she wanted me to render, unless she felt that she was paying for it that way. Said she did not feel at liberty to call upon me at any time for anything, and that is why she wanted it to be a business contract strictly. I could not tell you all the things I did for her. I asked her to go to Mr. Coke at the time she made this deed. I wanted her to be protected. I did not make any suggestions, except that I wanted her to be absolutely protected against everything, and I would not touch it or consider it under any circumstances until she had gone to Mr. Coke and discussed it with him so she would be thoroughly protected. I have been looking after her grave; am still doing it. That was part of my promise, part of my contract, and I am taking care of Mr. Young's grave as well. Mrs. Young had Dr. Embree with her. He was a neighbor, and he treated her for any little troubles that she had, but in her last illness I called in Dr. Embree and asked him to let me call my own family physician. I felt that I would be better satisfied to have his opinion, his diagnosis of the case, so I called my family physician. Dr. Embree visited Mrs. Young frequently. The physician I called was Dr. Baird. Dr. Embree called him at my request, and I called him too. Dr. Baird and Dr. Embree are doctors of standing. She used my automobile, and the nurse, myself, and frequently some neighbors would go with her, and whenever she wanted it she would telephone me that she wanted it, say she wanted to go driving, and telephone me just like it was hers. She would telephone me that she wanted to go driving at 2 o'clock, or 4 o'clock, just as she wanted to. She did not have a car. She used my car, and it would be sent for her when she telephoned, just as if it were her very ·own. She had no expenses, no upkeep of the car, no driver to pay. Mrs. Young knew that she had a standing invitation, and I always fixed a place for her at the table. She knew she was welcome, and that she was expected. She would come in without an invitation; she dropped in just like my own family did. It was as definitely understood as if I were her daughter and she my mother. She would do that without formal invitation. She always felt at liberty to ask anybody that was in her home, and in that way entertained many of her friends. After Mr. Young's death the rela-

tions that existed between Mrs. Young and myself were just as close, just as binding, just as affectionate as you could imagine. Mrs. Young's personal appearance was very aristocratic, very highborn, very elegant looking. She dressed very elegantly, in keeping with her birth and her money and her position. She was cheerful, wholesome, truthful, and honest, and splendid and noble, in every sense of the word. There wasn't a little, malicious, disagreeable thing in her. I am sure of that because I had ample opportunity to know in the most intimate fashion that it was possible for a human being to know. At the time Mrs. Young made the deed to me I was not dictating to her. She was doing the things she wanted to do. She and Mr. Coke settled that. I made no dictation whatever to her. I never attempted to alienate Mrs. Young from Mrs. Feegles, or any of her relatives. I would not stoop that low. I could not do a thing like that. I have no disposition to be a home breaker, or disturber of families in any way. On the other hand, I urged and begged Mrs. Young to look over the shortcomings and all the hurts that she might have received, because I thought life too short to harbor a grudge against anybody for any reason whatever. I do not harbor them myself, and I certainly would not urge Mrs. Young to do a thing like that. I don't know anything about the law in regard to the making of wills."

Mrs. Feegles testified that:

"Mrs. Young seemed to think the world and all of Mrs. Knight. There was no one came in between them. That was what disgusted me, because I thought I.ought to come in before anybody else. It was in 1902, in July or August, when she deeded me that property. She said the reason she gave me that property was because she ,wanted to do something for me. I was living with her at the time. After that Mrs. Young wanted me to deed the property back to her, and she came to my house and asked me to do it. She said she would give me a good price for it, and I says 'I don't think you ought to have it back.' Mrs. Young asked me not to take any steps after her death to recover back her property. The consideration in the deed which Mrs. Young made to me after Mr. Young's death was $1. She said it had to be $1. She made the same trade about that piece that she made about all the rest of her property; she got all the rents from it while she lived. She told me she was going to give it to me, but that she was to get the rent out of it while she lived. I was living with her at that time. She was feeding me at that time, and that was all. I left after she· told me she had made me a deed, because she didn't treat me right. I won't be positive when she told me she had deeded me the property, but I had made up my mind about two weeks before she told me about the property, to go. She told me she was going to deed it to me when I first came to live with her. I came down town and went to the courthouse to see if it was there, because I doubted it. I doubted it because they had treated me so funny and cool that I had come to the conclusion that I couldn't believe what she told me about the property, but they showed me the deed at the courthouse. I sold the place last year some time. I am to get $5,000 for the place, and I have already got $2,-000 of it. I believe they paid me $1,500 in cash and the balance in notes. I do not know whether my contention in this case is that my sister ought not to have sold anything but her life estate or not. I do not know anything about it. I claim in this case that the relatives of Mr. and Mrs. Young ought to be allowed to participate in the distribution of this estate, on the ground that Mrs. Young did not have the right to make any deeds to that property. I did not go back to her after I left her the last time. I couldn't have been of much service to her. We are com-

manded to return good for evil, but it don't seem like we do it, and I did not do it. I did not have anything to do with her funeral arrangements. I did not have anything to do with looking after her grave. I have been to her grave since she has been dead once, about a year ago. Mrs. Young was kind of like myself, high-tempered. I am not so high-tempered as I was once. I try to keep my temper under control now more than I used to. She was just in some things and in some she wasn't. When she got mad at anybody she was terribly mad, and I am kind of like her. There were some good traits in my sister's character, some things when she took a notion, when she took a notion to Mrs. Knight there was nothing would be too hard for her to do for her. She would have done anything on earth for those people. Besides, the deed to the lot, my sister gave me a little money sometimes. Directly after she sold the Sumpter property she gave me $500. After that a few dollars now and then, amounting to about $700 or $900 altogether. She gave me the $500 before I came down there, because Mr. Young had requested her when she sold some property to pay me $500. I suppose he wanted to try to pay for that place I deeded back to him, that $200 difference that he owed me. He said when she sold some of it to give me $500. I never considered the $900 much of a gift because I had worked for her years and years before, and I thought I had earned it."

The testimony of Mrs. Knight and Mrs. Feegles is quite voluminous, and we have copied only excerpts therefrom, deeming that the part so copied is all that is necessary for a proper decision of the case.

For a proper determination of the propositions in controversy herein it becomes necessary to construe the last will and testament of J. B. D. Young. It is provided by the first clause of the will as follows:

"It is my will and desire and I do hereby bequeath all my property, both real and personal, to my beloved and faithful wife, Mrs. L. V. Young."

This clause standing alone vested absolutely the fee-simple title in all the property then owned by J. B. D. Young in Mrs. Young. This does not seem to be controverted, but it is contended by appellant that clause 5 of said will limits and prevents clause 1 from having the effect its language imports. Clause 5 reads:

"I further desire and hereby will and direct that upon the death of my wife the property which she then owns shall be equally divided between her relatives and my relatives, it being intended that she shall have full power to control and dispose of the property during her life."

[1, 2] Appellant's contention, as we understand it in effect, is that clause 5 of said will limited Mrs. Young's rights in said property to a life estate, that the disposition of said property during her lifetime in the manner it was done by her was unauthorized and fraudulent and done for the purpose of circumventing and defeating the terms of said will, and that said will made Mrs. Young a trustee for the benefit of his and her relatives at the end of her life. We do not concur in the contention of the appellant.

"It is a primary canon of construction of wills that the intention of the testator shall be discovered and effectuated whenever that can be done within legal limitations, but in case of re-pugnancy that construction is favored which admits of immediate vesting of the entire estate."

The will of J. B. D. Young, in our opinion, clearly shows on its face that he intended to invest in Mrs. Young an absolute fee to the property therein bequeathed, and it was to be in no way affected by clause 5, which gave her "full power to control and dispose of the property during her life." This clause is not such a legal limitation upon the estate granted to Mrs. Young in the first clause of the will as to make it ambiguous and permit evidence of the maker's intention different from the legal import of the language of the will itself. We see nothing in the evidence which, in our opinion, tends to show that Young had any other intention than to place the fee to the property in his wife. All the property had been accumulated during their married lives, and was therefore community property, except the homestead tract, which was the separate property of Mrs. Young, it having been so made by conveyance from her husband. They were very devoted to each other and had lived together for over 30 years, and at the time of his death there was existing on the part of neither any special attachment for any of their relatives, who were the plaintiffs. From the circumstances surrounding him at the time of making his will Young's solicitude was for his wife's welfare, and that clause 5 was placed in the will merely to provide for a contingency; that is, if any of the property remained on hand at her death, it was to be equally divided among their relatives; in other words, we construe clause 5 in connection with clause 1, to mean that Mrs. Young should have the absolute right to dispose of the property during her life, and thereby vest a title in fee to it to the exclusion of his or her relatives. The use of the term, during her life, was not intended to limit the title to the property in Mrs. Young to a life estate, but to designate the time when the relatives should take in the event she had not disposed of it, and there was any remaining in her hands at the time of her death. There was no property remaining in Mrs. Young's hands at her death, except her separate property, and J. B. D. Young's will did not deal with that, and Mrs. Young had the right to do as she pleased with it.

In support of our view that Mrs. Young was vested under the will with an absolute fee-simple title in all the property and empowered to dispose of it, we cite the following authorities: Article 1106, R. S. 1911; Hanna v. Ladewig, 73 Tex. 37, 11 S. W. 133; Spea v. Ligon, 59 Tex. 233; Livingston v. Koenig, 20 Tex. Civ. App. 398, 50 S. W. 463; Young v. Campbell, 175 S. W. 1100; Irvin v. Putnam (Ky.) 89 S. W. 521; Ide v. Ide, 5 Mass. 503; Halliday v. Stickler, 78 Iowa, 388, 43 N. W. 228; Silvers v. Canary, 109 Ind. 267, 9 N. E. 904; Leggett v. Firth, 132 N. Y. 7, 29 N. E. 950.

[3] If it should be conceded that the will

conferred a life estate in Mrs. Young, which we do not, it also gives to her full power to control and dispose of the property, which power is broad and unlimited.

In Hanna v. Ladewig, 73 Tex. 37, 11 S. W. 133, where like power was conferred upon a life tenant the tenant conveyed the property, and the remaindermen sought to set aside the conveyance. In construing the extent of the powers granted by the will, Mr. Justice Stayton, speaking for the court, said:

"The power conferred on Mrs. Hinkly by the will of her husband was as broad as could well be conceived, and no limitation was placed on its exercise other than such as her own wish and pleasure might dictate. The will declared that she should have power to 'absolutely dispose' of the property, not for some specific purpose pointed out by the testator, but 'according to her pleasure.' * * * Appellants do not stand as creditors or persons having fixed rights in the property, not to be divested unless by a conveyance made on valuable consideration Mrs. Hinkly felt compelled for her own support or any other consideration to sell it. Whether they should ever receive or become entitled to the property Walter Hinkly made dependent upon the volition, pleasure, and act of his wife, who was the mother of the persons who were to take if the wife did not execute the power conferred on her. Speculation as to why he conferred on her such a power would be unprofitable, but it is likely that he felt he could safely intrust to a mother a power in the nonexercise of which her own children were interested. She having exercised the power conferred upon her, through whatsoever motive, or upon whatsoever consideration, their contingent right was forever cut off when it was once exercised, and the fact that the property was reconveyed to her is a matter of no importance. * * * The plaintiffs showing no title in themselves, it is unnecessary to consider other questions presented in the record."

In Livingston v. Koenig, 20 Tex. Civ. App. 398, 50 S. W. 463, where a like power was given a life tenant, Mr. Justice Williams said:

"The pronoun 'same' evidently refers in each instance to the same antecedent, viz., the property, and the power is given over that and not merely over the life estate. A grant of power to dispose of the latter would be wholly useless and senseless. The power is 'discretionary and unrestricted,' not only to sell, but to dispose of, the property. This embraces the power to give it away unless it is limited by other parts of the will. The only other part which could be claimed to have that effect is the third clause, wherein the testator bequeaths to her children the remainder of her estate after the termination of the life estate. This does not impair the force of the language used in conferring the power, because it is only what is to remain of the property; that is, such as has not been taken out of her estate by the exercise of the power that is bequeathed to the children."

In both the above cases the property was community and conveyed without valuable consideration.

It is insisted by appellant that the will conferred a trust on Mrs. Young only in the property for the benefit of relatives, subject to use by her for her support, etc. That the sale and transfer of the Slaughter tract was without consideration, fraudulently conveyed, and that the purchaser had notice thereof.

On the proposition that Mrs. Young was a trustee as claimed, the case of McMurry v. Stanley, 69 Tex. 227, 6 S. W. 412, is cited in support of appellant's contention. In that case a will similar in some respects to the one here involved was being construed. A demurrer had been sustained to the petition, and in passing upon the case Mr. Justice Stayton, as was his custom, wrote an able opinion in which, among other things, he said:

"We are of the opinion that N. G. Bagley took, under the will, an estate in fee in the entire property, but that this was in trust for the beneficiaries named in the fourth paragraph of the will, except as their right was limited by the right given to him to use and dispose of the property during his lifetime, which was given by the express terms of the will."

He further says:

"If Mrs. Bagley had provided in express terms in her will that the part of her estate remaining at the time of her husband's death should go to the persons named in the fourth paragraph, then a legal estate therein would have vested in them under the will; but this she did not. * * * It is evident from an inspection of the will before us, that it was not the intention of the testatrix, by force of the will alone, to vest in Jessie McMurry and Flora Brown a legal estate in remainder to be enjoyed by them after the termination of the life estate in N. G. Bagley."

In the Young will there is no express provision that the remaining property at his death should go to his relatives, so no estate vested in them under the will. The McMurry Case clearly decides that where the will provides for the disposition of the property by the first taker as in this case, and there is a disposition, the title vests absolutely in the grantee. It is shown that all of the property had been disposed of before Mrs. Young's death, except the homestead tract, and this was her separate property. This she had the right to devise, as it was not affected by the will of Mr. Young.

[4] As to the right of appellant to pursue the proceeds of the property sold by Mrs. Young, we are of the opinion that this proposition is settled adversely to appellant by the opinion in the McMurry Case, supra, which holds that:

"There is nothing in the relationship of the parties or the purposes for which the power to use and dispose of the property was most positively given to the husband which would authorize a holding that the testatrix intended that her nieces should have the right to follow and have the proceeds of any part of her estate that might be disposed of by her husband."

[5, 6] Now as to the proposition of no consideration for the disposition of the Slaughter tract: As we hold the will gave to Mrs. Young an absolute right to dispose of the property, there being no limitations expressed as to the manner, mode, or purpose for its disposition, we think it immaterial how and for what purpose it was disposed of. We take it, however, that there was a valuable consideration for its transfer. The testimony of Mrs. Knight shows that there was paid to Mrs. Young $10 in cash, which was nominal, and further that at Mrs. Young's

suggestion an annuity of $600 was provided for her, and also that at Mrs. Young's solicitation Mrs. Knight was to render her personal services in caring for and looking after her as a daughter would her mother. This Mrs. Knight did faithfully until Mrs. Young's death. How Mrs. Knight performed her contract is detailed in her testimony above set out. This shows, we think, a consideration that cannot be measured by dollars and cents, and to a lone woman in Mrs. Young's condition of inestimable value. This testimony of Mrs. Knight is not controverted, and we see no reason why it should be ignored.

There is no evidence of deception practiced on Mrs. Young by Mrs. Knight or by her husband, R. E. L. Knight. In this transaction it seems Mrs. Young had another attorney representing her; at least, there is no proof that Mrs. Knight and her husband unfairly and fraudulently induced Mrs. Young to make the transactions, but that she acted in accordance with her own wishes.

The judgment is affirmed.